# IN THE COURT OF APPEALS OF IOWA

No. 21-1853
Filed February 16, 2022

**IN THE INTEREST OF J.A.,**
**Minor Child,**

**J.J., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Clinton County, Kimberly K. Shepherd, District Associate Judge.

The father appeals the adjudication of his child as a child in need of assistance. **AFFIRMED IN PART AND REVERSED IN PART.**

J. David Zimmerman, Clinton, for appellant father.

Thomas J. Miller, Attorney General and Mary A. Triick, Assistant Attorney General, for appellee State.

Barbara E. Maness, Davenport, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

J.A. is a seven-year-old child with severe asthma. Following his parents' unilateral decision to reduce his daily medicine, J.A. suffered a near-fatal asthma attack in June 2021. This led to J.A.'s intubation and hospitalization, and the Iowa Department of Human Services (DHS) became involved with the family. Until court ordered, the parents resisted working with DHS or providing signed releases for J.A.'s medical information. Under these circumstances, the court adjudicated J.A. a child in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(b), (c)(1), (c)(2), and (e) (2021). The father appeals each of the adjudicatory grounds.[1]

**I. Background Facts and Proceedings.**

In June 2021, DHS became involved with J.A.'s family based on an allegation his parents failed to provide necessary medical care. J.A. was intubated and hospitalized for a near-fatal asthma attack on June 21, and it was alleged this attack was the result of the mother's and father's failure to administer his daily asthma medication as prescribed. J.A. also had a near-fatal asthma event in March 2020 and had reportedly missed two follow-up medical appointments after he was released from the hospital that time.

DHS petitioned for temporary removal of the child from the parents' care while J.A. was still in the hospital, which the juvenile court granted on June 28. J.A. was placed with his paternal aunt. Only a few days later, the State filed a CINA petition, asking the court to adjudicate J.A. under section 232.2(6)(b), (c)(1), (c)(2), (e), (f), and (n).

---

[1] The mother does not appeal.

The removal hearing was initially scheduled for July 6. Then, at the hearing, there was a question if the parents had been properly served and it was noted they had just recently moved to Illinois—raising a question of proper jurisdiction. The parents resisted removal but needed more time to develop what evidence they would present. From the bench, the court ordered J.A. would remain in the aunt's care and continued the removal hearing.

The contested removal hearing took place on August 4. The mother testified about the serious asthma attack J.A. experienced in March 2020. J.A. was intubated for three days at the University of Iowa Hospital. When he was discharged, he was prescribed to take two puffs of Flovent twice each day. The parents initially administered the medication as prescribed. Then, in February 2021, the mother took J.A. to the local hospital twice because he was wheezing and had a cough. J.A. was prescribed a short-term medication at those visits but was supposed to continue with his normal Flovent prescription, of which the parents were aware. He was also prescribed daily allergy medication that the parents gave him as prescribed.

According to their testimony, the parents were separated and living apart from September 2020 to early June 2021—shortly before the medical emergency that caused DHS to become involved. J.A. and his three siblings lived with the mother during this time, so she was usually the one who gave J.A. his medications. But both parents testified that they mutually agreed in March of 2021 to start giving J.A. only half of the prescribed Flovent each day. The mother admitted she did not personally have a conversation with J.A.'s doctors about any concerns with Flovent or the dosage J.A. was prescribed before she agreed to reduce the amount she

gave him. And the father admitted that "[n]o medical provider" gave them the direction to reduce J.A.'s medication, testifying, "[W]e did our research on our own, and we decided to lower his medication." The father was asked whether he raised his concerns with the medication or dosage to J.A.'s doctor, and he testified he spoke to her about changing the medication in March 2021 and "[s]he didn't recommend it." The father continued: "Yes. She didn't recommend it, but we still lowered it. We could have sought out a different doctor's opinion, but we ended up deciding to lower it. We tried that."

Both parents agreed to administer J.A.'s medication, which had been switched from Flovent to Dulera following his June 2021 hospitalization, as prescribed going forward. Yet when the mother's attorney asked her if she would be willing to "work with [DHS] to assure [J.A.'s] safety," she answered, "No."

After their presentation of evidence, both parents argued J.A. should be immediately returned to their care, relying on the fact that they agreed with the prescription of Dulera and their stated intentions to administer it as prescribed. The guardian ad litem (GAL) argued:

> I do have concerns about the health and safety of this child, and I would like to see some follow through before he was returned to the care of the parents. I don't think that would be a long period of time but to see follow-up with attending the follow-up medical visits, which were missed after the last big event, according to—according to the records. So for this—At this time, I'm thinking the removal should continue, and we would further consider that as we move forward with the case.

The juvenile court confirmed J.A.'s removal from the parents' care, citing the parents' decision to halve J.A.'s medication against medical advice even though it was apparent his asthma was severe and the choice could be fatal. The court

found, "The parents have shown a pattern of uncooperative behavior with doctors and social workers as it pertains to their son and his health and safety."

The CINA hearing took place September 29. The State opened by stating:

> Your Honor, we are asking that the parents cooperate with [DHS] at this time, sign all releases so that we are able to ascertain that the child is receiving the medical care that he is scheduled for, and we can get that information and share that with the Court. . . .
> And again, it's just the cooperation that we're really—really wanting and needing back from the parents in order to go forward with this case and get [J.A] back in their home, and we'll need that cooperation to do the social history, and—and I believe that's all . . . .

The DHS social worker testified he visited the family home in Illinois and had no concerns with the home or J.A.'s three siblings, who remained in the parents' care. When asked about J.A.'s medical appointments since removal, the social worker testified he had yet to see J.A.'s medical records because the parents had not signed the necessary releases. According to the social worker's testimony, while the parents were resistant to sign the releases, they told him they would cooperate with DHS if court-ordered to do so. The social worker testified he would not support returning J.A. to the parents' care until DHS had "an opportunity to get signed releases and request medical records and just confirm that the parents are indeed following through like they say they are." Each parent testified they would sign the necessary releases and give J.A. his medication as prescribed if J.A. was adjudicated CINA.

The court granted the CINA petition on four of the six grounds, adjudicating J.A. under section 232.2(6)(b), (c)(1), (c)(2), and (e). In doing so, the court noted the parents' refusal to sign medical releases for DHS was the reason J.A. could not be returned to their care. The decision to refuse until court-ordered—as "a

matter of 'principle'"—caused J.A. further trauma and suffering as he missed his parents and siblings and wanted to return home.

J.A. remained outside of parental care at the time of the November 9 dispositional hearing. At the hearing, the State asked the court to grant DHS discretion with regards to visitation, noting DHS was "looking to do some extended home visits with the parents." Because the parents were living in Illinois, the approved interstate compact on placement of children[2] (ICPC) was needed before J.A. could be returned to parental care, but it was DHS's "intention as soon as [it] ha[d] an approved ICPC to bring it to the court's attention and ask for a modification of placement at that time." The GAL was in agreement, expressing she was "very pleased the parents have cooperated so fully, that [J.A.'s] medical needs are being met, and [that she would] be glad to see him back with his family as soon as everything works out." Both parents expressed their hope they would be given extended visitation with J.A. while waiting for the approved ICPC, and the court indicated it agreed that was appropriate but would leave visitation at the discretion of DHS.

The father appeals the adjudication of J.A. under each of the four grounds.[3]

---

[2] *See* Iowa Code § 232.158.

[3] Based on all parties' and the court's comments during the dispositional hearing, it is possible J.A. was returned to parental care and the CINA action closed after November 16, 2021—the close of our record on appeal. *See* Iowa Code § 232.103(4) (allowing the court to terminate an order and release the child from court involvement if "[t]he purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment."). We have considered requesting additional record to learn whether the CINA action has been closed. *See Albia Light & Ry. Co. v. Gold Goose Coal & Mining Co.*, 176 N.W. 722, 723 (Iowa 1920) ("It is our duty on our own motion to refrain from determining moot questions."); *see also In re L.H.*, 480 N.W.2d 43, 45 (Iowa 1992) ("Matters that are technically outside the record may be submitted in order to establish or counter a

**II. Standard and Scope of Review.**

"We review CINA proceedings de novo." *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). In doing so, our primary concern is the child's best interests. *Id.*

**III. Discussion.**

"The grounds for a CINA adjudication do matter." *Id.* at 41. So we must consider whether each of the challenged grounds for adjudication were proved by clear and convincing evidence. *See id.*; *see also* Iowa Code § 232.96(2). We will affirm the grounds supported by the record and reverse any others. *See J.S.*, 846 N.W.2d at 40–41.

**A. Section 232.2(6)(b): Physical Abuse or Neglect.**

A child whose parent has physically abused or neglected the child, or is imminently likely to abuse or neglect the child, is a CINA under section 232.2(6)(b). "'Physical abuse or neglect' or 'abuse or neglect' means any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent . . . ." Iowa Code § 232.2(42). In order to properly adjudicate J.A. a CINA under section 232.2(6)(b) for past abuse or neglect—as opposed to "imminently likely abuse or neglect"—he must have sustained a physical injury, that injury must be the result of the acts or omissions of the parents, and the physical injury must have been nonaccidental. *See In re J.W.*, No. 14-0515, 2014 WL 3749419, at *2 (Iowa Ct. App. July 30, 2014) (citing *J.S.*, 846 N.W.2d at 36).

---

claim of mootness."). But, as previous CINA adjudications can be used against parents in future involvement with DHS, *see, e.g.*, Iowa Code § 232.116(1)(d), we conclude the question of whether J.A. was properly adjudicated a CINA is not moot even if this CINA action has already closed.

We agree with the juvenile court that the State proved this ground. Against medical advice, the parents intentionally reduced J.A.'s asthma medication, which was prescribed to him after his last near-fatal asthma attack in March 2020. Without the proper dose of the prescribed medication, J.A. suffered another severe asthma attack, eventually going into respiratory arrest[4] and requiring intubation and mechanical respiration to survive. His parents' intentional omission of giving him the needed medication resulted in this severe, nonaccidental physical injury.

**B. Section 232.2(6)(c)(1): Mental Injury.**

A child who has suffered or is imminently likely to suffer harmful effects as a result of mental injury caused by the acts of the child's parent is a CINA under section 232.2(6)(c)(1). "'[H]armful effects' . . . 'pertains to the physical, mental, or social welfare of a child.'" *J.S.*, 846 N.W.2d at 41 (citation omitted). And a "mental injury" is "a nonorganic injury to a child's intellectual or psychological capacity as evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior, considering the child's cultural origin." Iowa Code § 232.2(35).

In our review, we can discern no findings by the juvenile court that relate to an injury to J.A.'s intellectual or psychological capacity, and it is not clear what evidence the State believed supported this ground. The CINA petition itself just lists the six grounds under which the State sought adjudication, and attached to the petition is a one-page summary of attested facts. The State presented no in-

---

[4] "Respiratory arrest" is "a state in which one stops breathing." *Respiratory arrest*, Merriam-Webster, https://www.merriam-webster.com/dictionary/respiratory%20 arrest (last visited Jan. 14, 2022).

person evidence at the adjudication hearing, relying on just a few exhibits it offered into evidence. In its response on appeal, the State argues this ground is met because "J.A. suffered from a life-threatening asthma event . . . , certainly a traumatic experience for a seven-year-old" and "also suffered months of confusion and sadness related to his inability to return home . . . due to his parents' refusal to engage in any meaningful way with service providers prior to adjudication." But the DHS report submitted at the adjudication hearing claimed, "[J.A.] appears to be in good mental health and there have been no behavioral concerns." So we do not think any purported sadness, confusion, or trauma rises to the level of "observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior" as necessary to adjudicate under section 232.2(6)(c)(1). *Cf. In re J.S.*, No. 16-0125, 2016 WL 1359122, at *5 (Iowa Ct. App. Apr. 6, 2016) (affirming adjudication under section 232.2(6)(c)(1) where the child had to be admitted to a psychology unit and "[t]he pediatrician linked the child's behavioral problems to [the mother's] manipulation and pattern of interactions intended to alienate the girl from both medical providers and her father"); *In re J.S.*, No. 14-1014, 2014 WL 4938012, at *1–2 (Iowa Ct. App. Oct. 1, 2014) (affirming adjudication based on "mental injury" where the parents placed their children in the middle of continued hostilities following their divorce, resulting in all three children attempting to harm themselves due to the emotional distress); *In re E.R.*, No. 14-0850, 2014 WL 4937999, at *1 (Iowa Ct. App. Oct. 1, 2014) (suggesting "mental injury" alternative would protect children whose "parents' behaviors toward each other and in the presence of the children have created harm").

We reverse the court's adjudication of J.A. under section 232.2(6)(c)(1).

**C. Section 232.2(6)(c)(2): Reasonable Degree of Care in Supervising.**

A child who has suffered or is imminently likely to suffer harmful effects due to the failure of the child's parent to exercise a reasonable degree of care in supervising the child is a CINA under section 232.2(6)(c)(2). As we stated earlier, "'harmful effects' . . . 'pertains to the physical, mental, or social welfare of a child.'" *J.S.*, 846 N.W.2d at 41. "Because of this broad definition, we have found such effects established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur." *Id.* at 41–42.

We are cautious to not "read section 232.2(6)(c)(2) so broadly as to render its terms meaningless." *E.R.*, 2014 WL 4937999, at *5. But as our court said when discussing this paragraph, "the inclusion of the phrase 'of care' denotes something greater in scope than simply inadequate or lack of supervision, as the phrase would be superfluous if the statute were applicable to only supervision deficiencies." *In re K.S.*, No. 10-0152, 2010 WL 1875729, at *2 (Iowa Ct. App. May 12, 2010) (interpreting of care to include "situations where a child is not provided proper care and treatment while under a parent's oversight"). Here, evidence showed that the parents were not consistently monitoring the medical care appointments for the child to address his asthma condition in addition to the medication management incident. As a parent, supervising a child's care includes following medical directives that safeguard a child from the imminent harm a lack of follow-through creates. No one else is tasked with the child's medical supervision and management. Likewise, while these parents exercised faulty judgment, which on its face might not fall under the "rubric of a failure to exercise

a reasonable degree of care in supervising the child," it is undisputed their lack of concern over the consequences of that medical decision and the serious ramifications proves a lack of concern that resulted in a near fatal episode to their child.[5] *E.R.*, 2014 WL 4937999, at *4.

The State proved this ground under section 232.2(6)(c)(2).

**D. Section 232.2(6)(e): Medical Treatment.**

A child who is in need of medical treatment to cure, alleviate, or prevent serious physical injury or illness and whose parent is unwilling or unable to provide such treatment is a CINA under section 232.2(6)(e). While the father purports to challenge this ground, none of his statements in his petition on appeal challenge the elements of section 232.2(6)(e). It is undisputed that J.A. needs prescribed medicine for his life-threatening asthma, and the parents were unwilling to give the medicine as prescribed. At the adjudicatory hearing, the parents testified they would administer J.A.'s new medication as prescribed, but we find no fault with the juvenile court's initial wariness of their claims based on their admitted past actions.

Therefore, we agree that J.A. is a CINA under section 232.2(6)(e).

**IV. Conclusion.**

We affirm the adjudication of J.A. as a CINA under Iowa Code section 232.2(6)(b), (c)(2), and (e). We reverse the adjudication under section Iowa Code section 232.2(6)(c)(1).

**AFFIRMED IN PART AND REVERSED IN PART.**

---

[5] As an exhibit at the hearing, the University of Iowa medical notes confirmed the child suffered two near fatal asthma exacerbations in the last year with a potential risk for anoxic brain injury.